## The Texas Mutual Life Ins. Co. v. R. A. Brown & Co. and Geo. T. Bordies, Administrator.

(March 26, 1880.)

COMPETENCY OF JURORS.— It was error in the court to refuse to allow defendant's counsel to ask each of the jurors the question: "Do you believe that, if a person commit suicide, it is conclusive evidence that he was insane at the time of committing the act."

IMPANELING JURY.— The defendant is not entitled to have the list of the jurors remaining after the striking by plaintiff called before he passes upon the jury.

ORAL EVIDENCE.— When a written assignment is lost and that fact shown, its contents may be shown by oral testimony. That question could not be properly raised by defendant.

PROOF OF DEATH OF INSURED.— The record of the coroner's inquest was not admissible to establish the death of the insured.

INSURANCE — PROOF OF LOSS.— A denial of liability, and refusal to pay on that ground, dispenses with the necessity of proof of loss. When the policy is payable ninety days after notice of death, and notice is given immediately after death, and there is a refusal to pay, suit may be brought at once. Suicide is no proof of insanity, *prima facie* or otherwise. It is error for the court to inferentially state that there was evidence of insanity.

APPEAL from Galveston county.  Opinion by QUINAN, J.

The first error assigned is:  The court erred in sustaining the objection of plaintiffs to defendant's question proposed to each of the jurors:  "Do you believe that, if a person commit suicide, it is conclusive evidence that he was insane at the time of committing the act?"

The act of 1876, regulating juries, in section 26 specifies several causes which shall be good causes of challenge, but it does not, by its terms, exclude the consideration of other causes than those enumerated.  Among those named are, that the juror "is biased or prejudiced in favor of or against either party."  To give this a literal construction, it would appear to mean a personal prejudice against or favor towards the parties as individuals; but in view of the controlling purpose of our laws, that the trial by jury shall be pure and impartial, we think that construction would be too

narrow. A prejudgment of his case, a conviction formed upon the subject of contention, must be quite as potent to deprive the party of the benefit of a fair trial as a merely personal prejudice against him. We think the question should have been permitted. Pierce v. The State, 13 N. H., 536; Hiatt v. Mutual Life Ins. Co., 2 Dillon, 572.

The second assigned error is: The court erred in sustaining the objection of plaintiffs to defendant's motion made after the plaintiff and intervenor had struck the names of jurors to whom they excepted and returned the list to the clerk, viz.: "That the jurors should be called so as to show the names remaining after the striking by the plaintiff and intervenor," so as to apprise defendant as to who were on the jury before defendant should be required to make his challenges. We do not think this well taken. The statute prescribes the form to be observed in impaneling the jury, and it seems to have been observed in this respect.

The third and fourth assignments may be considered together. They relate to the proof made of the assignment of the policy of insurance; of its delivery to R. A. Brown & Co. by Estelle. It is a sufficient reply to these objections that the question, whether there was a verbal assignment of the policy, was one which concerned chiefly the assignee and the administrator, Brown. The company were interested only "that it might not be compelled to pay the assignee and the legal representatives of the insured." All parties who could claim an interest in the policy were before the court, and its judgment would fully protect the company against that possibility. Bliss on Ins., p. 551.

We think, however, that the proof offered of the assignment was in accordance with the rules of evidence in such cases. Andrews proved the loss and diligent search for what purported to be an assignment of the policy from Estelle to Brown, and a copy of that instrument. And Goodwin proved the execution, by Estelle, of the assignment, of which the Exhibit X, attached to his deposition, he

swears is a copy. His language is: "I was present when the original assignment (of which Exhibit X is a copy) was executed, and saw William C. Estelle sign said paper as assignee, on the 13th day of October, 1874." Greenleaf, § 558; Bateman *v.* Bateman, 16 Tex., 544. There can be no reasonable doubt of the existence, loss, contents and execution of the original assignment.

The sixth assignment of error is: The court erred in sustaining the objection of the plaintiff's offer (*defendant's* offer as shown by bill of exception) to introduce the record of the inquisition by the coroner on the body of W. C. Estelle, deceased, as also defendant's offer to introduce the testimony of G. W. Williams, a witness at the coroner's inquest, and who had died before the trial of the cause, as shown by bill of exceptions No. 4. We are of opinion that there was no error in this ruling. It was incumbent upon the plaintiff to make proof of the death of Estelle, and the proof might be made without the introduction of the coroner's inquest. The inquest, as offered to prove what a deceased witness testified before the coroner, was clearly inadmissible in this suit, as plaintiffs were not parties to that proceeding. Greenleaf, § 125.

The eighth error assigned is: That the court erred in instructing the jury that denial of liability by the insurers waives proof of loss. This is distinctly laid down in May on Insurance, page 573, citing 9 Howard, 390, and other cases; 30 Vermont, 659: "A distinct denial of liability and refusal to pay on the ground that there is no liability is a waiver of the condition requiring proof of the loss."

The seventh assignment is: That the court erred in charging the jury that the defendant was liable for the amount of the policy, with interest, less three quarterly payments, from ninety days after proof of death, when no denial of payment was made until the filing of the suit, etc. The proposition under this assignment is, that where a life policy contains a promise to pay "in ninety days after due notice and satisfactory proof of death," interest does not accrue until the date of legal demand.

Flint testified "that he called upon Richardson, the agent of the company, and that he refused to recognize either the policy or the assignment, and maintained that neither constituted any claim against his company." Andrews testified, "the proof of death was made out and delivered to the defendant company, within a few days after Estelle's death." Richardson testified: "I refused to recognize either the policy or assignment as constituting any ground of claim against this company. R. A. Brown & Co. informed me by letter that they held the policy by virtue of an assignment from Estelle, which they found with the policy after his death, and that Estelle was indebted to them, etc.; the notice was sent to me the 19th of October."

This denial of liability on the part of the company was, as we have seen, a waiver of the condition requiring proof of loss. "And, of course, the waiver of the proof is a waiver of the condition that payment is not to be made till a limited time after the proof, so that in such cases suit may be brought at once upon the denial of the liability, although the time within which, after the proof of loss, the payment would be demandable, may not have expired." May on Insurance, sec. 574.

The eleventh error assigned is: The court erred in refusing to instruct the jury "that an assignment of a policy of insurance, to be a valid one, must be made in the lifetime of the assured, and it must be accepted by the assignee. If you believe, from the evidence, that Estelle and R. A. Brown & Co. never had any understanding during the life-time of said Estelle that the said assignment should be made, and that the said assignment was not delivered to R. A. Brown & Co. during the life-time of Estelle, you will find for the defendant." The objections under this assignment are to the validity of the assignment, and to the notice to the company. We have considered these questions under the previous assignments, and do not think the objections are tenable.

The remaining assignments of error (except the four-

teenth) are taken to the charges of the court given and re-
fused, and the sufficiency of the testimony to support the
verdict of the jury, and may well be considered together.
They involve the questions whether Estelle committed sui-
cide, whether the act was the act of an insane man, and
the correctness of the instructions to the jury upon these
subjects.   The testimony of the witnesses bearing upon the
condition of Estelle's mind has reference to two periods of
his life; the first during his residence at Columbus from
1865 to 1872, and the second during his residence at Gal-
veston.

Dr. Bowers was a practicing physician of thirty-five
years' standing.   He became acquainted with Estelle in
1865, and knew him till he died.   Estelle left Columbus
in 1871.   The doctor states: "I had every opportunity to
learn his habits, disposition and character from the inti-
macy existing between us; he considered himself a member
of my family; he was a quiet, orderly gentleman; he was,
at times, of a melancholy mood, particularly since the
death of his wife, which occurred in 1867, and from the
fact of being out of business for a good while and in great
poverty; I never looked upon his mind as being unsound;
the occasional despondency he at times experienced was
always, in my opinion, caused by the circumstances sur-
rounding him; I never heard any one express the least
doubt as to his sanity; his mind always remained clear
and unclouded; after the death of his wife he was in a very
despondent and unhappy mood;  .  .  .  his business did
not prosper;  .  .  .  he took to drinking for a week or
two, a regular spree; this was before he lived at my house;
at the end of the spree I was called to see him and was
told he had poisoned himself with laudanum; on examina-
tion I could find no evidence of opium or any other poison-
ing except the toxic effect of spirituous liquors; he soon
recovered, and from that time, or as long as I knew him,
he never drank another drop; at no time did I consider
him insane or liable to become so; adverse circumstances

would render him unhappy and despondent, but not more so than many other people whom I have known and who never became insane." On his cross-examination Dr. Bowers repeats that he never saw any symptoms of insanity in Estelle, and never knew him drunk but one time, when he acted like most drunken men but showed no sign of insanity.

Mrs. Barnard knew Estelle in 1865; he and his wife boarded at her house; she never saw him under the influence of liquor. She states: "Mr. Estelle was of a melancholy disposition, and was what I would call an eccentric man in his disposition; he has told me often that he felt as though he would commit suicide; talked as if he had it to do, and could not keep from it if he wished; in May, 1868, in Columbus, he attempted suicide; he told me of it, and that he could not help it; he promised me that he would not attempt it again; I cannot say what was the cause of his rash act; he told me that he was under the influence of liquor at the time; after promising me that he would not attempt suicide again, he made the second attempt about two or three days afterwards; I last saw Mr. Estelle in February, 1874; I at that time thought him perfectly sane."

This is all the testimony in reference to Estelle and the condition of his mind previous to his residence at Galveston. During his residence here all the witnesses concur in saying that his habits were regular and temperate. He was book-keeper, and a very competent one, for R. A. Brown & Co., and cashier from 1872 to the time of his death. There is no testimony in the slightest degree tending to show other than a perfectly sane condition of mind from the time of his taking up his residence in Galveston to the day when he took out his policy of insurance. Captain Roberdeen states that he never saw him under the influence of liquor but three times in his life—once at Columbus, once at Galveston in 1873, and last on the day of his death. He says he was somewhat eccentric towards his friends while under the influence of spirits; his cheerfulness was increased while his gloom was intensified. It

seemed to heighten his admiration for his friends and in-
tensified his sorrow.

On the 12th of October, 1874, he applied to Dr. Richard-
son, the agent of the insurance company, for a policy on
his life for $5,000. His answers to the questions which
form part of the contract of insurance deny that he had
ever been afflicted with insanity, delirium tremens, fits or
any disease of any vital part, or that he was then afflicted
with any disease of any kind. The physician of the com-
pany, who examined him upon his application, testified that
he was apparently in most excellent health, a most desir-
able risk, the action of his heart regular, the condition of
his pulse regular and uniform — no physical or mental dis-
turbance of any kind. He seemed anxious to get the policy
as soon as possible.

Mr. Estelle impressed the officers of the company " with
the business-like manner in which he made inquiries in re-
gard to the different plans of insurance. He was calm,
cool, deliberate, showing neither excitement nor mental
disturbance of any kind." Dr. Richardson says: " I read
over to him carefully all the questions, to which he made
answer as in his application; he discussed with me the sev-
eral modes of payment of premium, informed me that he
preferred a policy on the quarter-yearly payment plan be-
cause he received a monthly salary; . . . discussed
with me the possible assignment of his policy for the ben-
efit of his wife in the event of his marriage, saying that he
contemplated marriage, and asked how this could be done;
on the 13th the policy issued; on the 14th Mr. Estelle got
the policy."

Mr. Shannon, who represented the Life Association of
America, testified " that a few days before his death Estelle
informed him that he contemplated effecting some insur-
ance upon his life, and inquired as to the rates and terms of
insurance; he was minute in his inquiries, and impressed
me with the business-like manner in which he discussed the
subject of insurance; on the following day, about 7 o'clock

in the evening, he came to my office; . . . he desired
me to write out his application for a policy of $8,000 on his
life; his examination was made by Dr. Randall the follow-
ing day, after which Estelle informed Mr. Shannon that if
the policy could be issued then he was prepared to pay for
it; I told him that policies were issued at the home office
of the company at St. Louis, and that if he desired it I
would give him a binding receipt; he thereupon paid me
one-quarter of the amount of premium upon his policy, and
I delivered him a binding receipt; I was impressed by the
calm, cool, deliberate, business-like manner of Mr. Estelle;
. . . the next day Estelle called at my office and stated
that he desired to assign his interest in the binding receipt
which I had given him, giving me the name of a young
lady whom he proposed to make the beneficiary; the as-
signment was written out, and signed by Estelle, with the
request not to give it publicity; there was nothing in his
appearance indicating nervous or mental disturbance of any
kind; I discovered nothing insane or irrational about him;
that night Estelle died."

Mr. Neblet testified that on the evening of Estelle's death,
after business hours, just as he was shutting up, Estelle
came to the office of the Texas Mutual Life Insurance Com-
pany; asked if his policy was ready; he remarked, in a
peculiar way, that he was anxious to get possession of the
policy as he might die before morning; I thought nothing
of this at the time, for such conversations are frequent in
relation to the delivery of policies. Mr. Sylvester was
present at this conversation and remembers that something
was said by Estelle, in a peculiar way, about suicide, to
which Neblet replied that suicide would not do; that there
was a provision in the policy exempting the company from
liability. Neither of these witnesses discovered anything
like insanity or irrational about him.

Mr. DeForest says that on the same day "Estelle called
in at the office in which he was employed and asked me to
go with him and take a drink, at which I was surprised, as

I had never known him to take a drink in my life; he said he felt like he would like to get on a drunk, and asked me to get on one with him; said that if he did get on a drunk he would never get sober; I never saw signs of insanity about Estelle."

On the 13th, Estelle, in presence of Godwin, executed an assignment of the policy to Brown & Co., asking him to sign it as witness. On the evening before his death, the testimony of Capt. Roberdeen is: "I was standing on the sidewalk in front of the 'Two Brothers Saloon,' about 9 o'clock P. M., when Mr. Estelle and another gentleman approached us from the east; Mr. Estelle recognized me and called me to him; we entered the saloon; Estelle exhibited great nervous excitement, and from some cause drew a pistol, which we took from him, and some money and checks which we deposited with the bar-keeper; he expressed a determination to see some particular person that night, and I, with others, assisted him into a carriage in waiting, which was the last time I ever saw him, dead or alive; I considered him greatly under the influence of liquor and oppressed by some sorrow, to me unknown, or by him expressed to me."

Manast says that that night at half-past eleven, as he was standing on Market street, Williams, the hack driver, rode up and informed them Estelle was dead; he accompanied Williams to the room; Williams stooped down and picked up a vial labeled "Prussic acid;" Estelle lay on his bed dead about twenty-five or thirty feet from where the vial was picked up; Estelle's face was swollen, and there was a glaziness of expression about his eyes.

Williams, the hack driver, went for Dr. Rogers, who accompanied him to Estelle's room. Dr. Rogers says: "When he reached the house, and as he was in the act of alighting from the carriage, Williams stooped down and picked up a vial from the sidewalk and handed it to me; it was labeled prussic acid and contained two or three drops of this poison; Estelle's face was swollen, and his eyes had a set and

glazed expression, which are the usual symptoms of death from prussic acid; I did not observe any odor of prussic acid, either about the body of Estelle nor in the room; he was very neatly dressed; the acid in nearly all of the drug stores is more or less diluted; a man could walk twenty feet after taking a dose of diluted acid.

Upon the succeeding day the policy of insurance was found with the assignment among Estelle's papers, in Brown & Co.'s safe, and on examination of Brown & Co.'s books, it was discovered that Estelle had made false entries in their books against them to the amount of $2,514, and that this embezzlement had been going on from July, 1874, up to the time of his death. The physician, Dr. Welsh, testified " that the smell emanating from the corpse of a man who dies from the effects of prussic acid is very perceptible."

This is a very full statement of all the testimony in the record, giving the history of Estelle's life, his habits, his mental condition and his death. And we have been thus particular because we think it will relieve us, in a great measure, from any very critical analysis of the charges of the judge, and from the necessity of deciding, among the conflicting and, indeed, bewildering decisions of the various courts, English and American, upon this vexed subject, involved in this contention, of suicidal insanity which is the better rule if any can be deduced therefrom. Indeed, the best authorities inform us that " there are no certain legal or medical tests by which this species of insanity can be demonstrated to exist. Each case must be determined by the circumstances attending it." And to judge correctly of the propriety of the charge of the judge in any given case, it must be looked at in the light of the testimony and facts to which it is to be applied. Even instructions which, considered by themselves, may contain correct legal propositions, may be erroneous and tend to mislead when viewed in connection with their bearing upon the circumstances of the case in which they are delivered.

The charges of the court in this case are as follows, so far as they relate to this question:

6. Should the jury believe that satisfactory proof that Estelle committed suicide has been adduced, they will inquire as to the condition of his mind at the time he did the act; and if he was then insane the policy is not void.

7. In order to establish such insanity as will entitle the plaintiffs and intervenor to a verdict, it is sufficient if the jury believe that he was impelled to commit the act by an insane impulse, while he had not the power to resist, and this although his death was caused by his voluntary act and though he knew and intended that his death should be the result of the act.

8. The act of suicide itself may be taken into consideration with the previous demeanor and conduct of the party, and all the facts and circumstances, as items of testimony, to be considered as to the question of insanity.

9. The jury are the judges of the evidence and are to determine whether Estelle, if he committed suicide at all, did so while in the full possession of his ordinary reasoning faculties or under an insane impulse which he could not resist. The weight of the evidence is for the jury to pass upon, and the court cannot take from you any testimony which tends to show that Estelle was or was not insane when the alleged suicide was committed.

4. Every man is presumed to be sane until the contrary is proved, and suicide by itself is no evidence of insanity, and if you believe that Estelle committed suicide within one year after effecting insurance with the defendant, he is presumed to have been sane at the time of his death; and unless it is proved, by the evidence in the case, that he was insane at the time of his death, you will find for defendant.

5. In determining the question of insanity you will inquire whether Estelle had reason sufficient to distinguish right from wrong. If you find that he had sufficient understanding to know whether the physical consequence of tak-

ing poison was death, and if his death was caused thereby, and if he knew the difference between right and wrong at the time of his death, and at the time could have resisted the impulse to suicide, he was not insane in contemplation of law.

If the jury believe the testimony that Estelle, the insured, was affected with insanity previous to his making the application for insurance, or that he concealed or denied the fact, the plaintiff cannot recover. There is no presumption, *prima facie* or otherwise, that self-destruction arises from insanity, and if you believe, from the evidence, that the deceased, excited or disturbed in mind from fear of exposure or loss of reputation, formed a determination and executed such intention by taking his life, because he preferred death to life, and that such excitement or fear did not produce insanity, then the defendant is not liable; . . . but if the deceased committed suicide while insane it would not render the policy void no matter what caused the insanity.

Recurring now to the testimony as to the character and condition of mind of Estelle while resident at Columbus, we think the conclusion from the proof is irresistible, that while there he was neither of unsound mind nor did he exhibit any indications of, or tendency to, insanity. This is made clear by the testimony of Dr. Bowers.

If, however, we give any weight to the evidence of Mr. Barnard, or rather to the declarations of Estelle to him, of his attempted suicide and that he felt as if he must kill himself, this result must follow, that his declarations to the insurance company, which formed a part of the contract of insurance, were untrue; that in fact he had then been afflicted with the suicidal monomania, and this would avoid the policy.

And now, as to his condition at Galveston: The law, as stated by the judge, is supported by all the cases, "that suicide is no proof of insanity, *prima facie* or otherwise." What, then, are the facts or circumstances developed respecting his life and habits and condition of mind there,

which indicate, in the slightest degree, a disordered intellect? Does any indication of it result from the fact stated by Roberdeen, that when under the influence of liquor "his admiration for his friends was increased, while his gloom was intensified?" Is this an unusual result from the use of ardent spirits? Is this the test of an insane mind? Life is not all sunshine. Moments of gloom and despondency will overtake the best balanced intellects, and if a conclusion of insanity is to be formed from these *indicium*, who among us could be pronounced sane?

Again, is it shown by the calmness, the deliberation, the business tact he showed in obtaining the policy of insurance upon his life? These are rather the indications of a perfectly sound mind. His perfect state of health, the regular action of his heart and the beat of his pulse, in sobriety, and attention to the business in which he was employed, does, to the very evening of the day on which he died, repel all just conclusions of disease of body or of mind.

But it is said that the fact of his having embezzled the money of his employers, the feeling of remorse or shame, and the fear of detection and exposure soon to overtake him, may be supposed to have affected his mind and dethroned his reason. To our thinking this conclusion is completely negatived by the circumstances in proof. His conduct about the obtaining the insurance upon his life, the urgency with which he sought it, and the eagerness he displayed to have the policy in hand, the jocular remark that he might die before morning, the assignment of it but a little while before his death, the intoxication induced evidently of purpose " to screw his courage to the striking point," the declaration, " that if he got drunk he would never get sober," the means prepared, a pistol in his pocket and, as we think, the proof indicates the poison at hand, the return to his room and the immediate act then of self-slaughter. These circumstances evince a predetermination and deliberation, a foregone conclusion, which excludes the idea of insanity, or insane impulse, or a diseased condition of mind.

We have little hesitation in saying that the testimony does not develop a single fact tending to show that Estelle was of unsound mind at the time of his death.   There are no circumstances to add to the fact of suicide from which it can be inferred.

The declarations which he made to Mrs. Barnard, so many years before his tendency then to suicide, besides being proved false by the testimony of Dr. Bowers, cannot be referred to in connection with the act of suicide, for the reason we have given, that if true they proved that he then was affected with the suicidal mania, and this would vitiate the policy.

Let us now consider the charge of the judge.   The chief objection to it, which impresses us, is the small foundation for it in the proof.   We look in vain to the testimony to discover anything therein which would require the discussion of the subject of insane impulses, which he had not the power to resist, or of the existence of a diseased or disordered state of intellect in Estelle, or of such excitement or fear which might prodnce insanity.

The oft-repeated instructions upon these subjects were, we think, calculated, unduly, to impress the jury with the idea that there was proof of Estelle's insanity.

But again.   When the judge charged that the jury might, with the fact of suicide, take into consideration the previous demeanor and conduct of the party and all the facts and circumstances, he should have instructed them as to the effect upon the validity of the contract of insurance of the declarations of Estelle to Mrs. Barnard, tending to prove the existence previously of the suicidal monomania, for the reasons which we have already given.

So, we think, the ninth charge was calculated to mislead them in this, that in instructing them " that the weight of evidence was for them to pass upon, and the court cannot take from you any testimony which tends to show that Estelle was or was not insane when the alleged suicide was committed,— it was, in effect, to tell them that testimony had

been admitted which tended to prove that fact, and to point their attention, in connection with the other charges in which he dwelt upon the subject of insane impulses not to to be resisted, directly to the testimony of Mrs. Barnard disclosing Estelle's previous recitals of attempted suicide, and his talk of how he had to do it, and could not keep from it if he wished."

Again: Although the phrase "insane impulse" is used in medical and legal works, in connection with the indications of insanity, we do not think, as addressed to the average juror, it is likely to convey the exact sense in which it is properly used.  In a legal or medical sense it means the impulse of an insane mind, whereas to the common comprehension it rather conveys the idea of a rash, sudden, thoughtless, unreasonable and crazy notion, necessarily springing from diseased mental faculties.

It remains to be considered what is the proof of suicide. The testimony, of which we have given a pretty full statement, in our judgment establishes that fact beyond a reasonable doubt.  The death of Estelle with appearance after death of one who had died by prussic acid; the finding of the vial so close to the scene of death with drops of that poison remaining in it; the declaration that, getting drunk, he would never get sober; the dread of exposure which was upon him; the eagerness to complete the business of insurance of his life,— these facts point inevitably to an act of self-destruction.

We conclude, because of the reasons indicated in this opinion: 1. The error of the court in not permitting the question to be asked of the juror.  2. The tendency of the charge to mislead the jury.  3. But especially because the verdict of the jury is not simply against the preponderance of testimony, but because it is against the evidence,— that the judgment should be reversed and the cause remanded, and it is so ordered.